COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges AtLee, Malveaux and Causey
Argued at Norfolk, Virginia


TONY CURTIS SPIVEY

                                           MEMORANDUM OPINION* BY
v.        Record No. 0282-23-1       JUDGE MARY BENNETT MALVEAUX
                                             MAY 14, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Tyneka L. D. Flythe, Judge

Kelsey Bulger, Senior Appellate Attorney (Virginia Indigent Defense
Commission, on briefs), for appellant.

David A. Stock, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a conditional guilty plea, the trial court convicted Tony Curtis Spivey

("appellant") of possession of a Schedule I or II controlled substance with the intent to distribute,

second or subsequent offense, in violation of Code § 18.2-248.  On appeal, he argues that the trial

court erred in denying his motion to suppress because the traffic stop was not supported by

reasonable suspicion and because the warrantless search of his car was not a lawful inventory

search.  For the following reasons, we affirm.

## I.  BACKGROUND

"On appeal from a denial of a suppression motion, we must review the evidence in the light

most favorable to the Commonwealth, giving it the benefit of any reasonable inferences."  *Knight v.*

*Commonwealth*, 71 Va. App. 771, 783 (2020) (quoting *Slayton v. Commonwealth*, 41 Va. App. 101,

103 (2003)).

---

\* This opinion is not designated for publication.  *See* Code § 17.1 413(A).

Officer Goff of the Newport News Police Department occasionally conducted "patrol checks," which included checking vehicle registrations, at a 7-Eleven store that was a "problem spot" for police. About a month prior to July 29, 2021, while doing a patrol check of cars parked at the store, he saw a black Mercedes sedan that was registered to appellant. Although Goff had never had personal contact with appellant, he knew, through police notifications, of "some incidents" involving appellant. On the night of July 28, 2021, Goff saw the same Mercedes parked in the area where Goff patrolled. He then ran a "warrant check" and learned that appellant's driver's license had been suspended.

While on duty the night of July 29, 2021, Goff saw appellant driving the Mercedes in the area where he was patrolling. Goff followed appellant and initiated a traffic stop. When appellant attempted to parallel park on the right side of the road, his car collided with another car. When the Mercedes stopped, it was about five feet from the curb and parked diagonally with the front end extending into the street.

When Goff asked about appellant's license status, appellant claimed he did not know his license had been suspended, but mentioned some paperwork he had received instructing him to be "careful" while driving. After having appellant exit the car, the officer returned to his patrol car and, after requesting further information, learned that appellant's license had been suspended for a "medical review." Because appellant could not lawfully drive the car and the car was parked in a manner that obstructed traffic, Goff and Detective Thompson, who had arrived at the scene, called for a tow truck.[1]

Before the tow truck arrived, appellant "flagged down an unrelated gentleman" to contact his wife to move the car. Because appellant was trying to contact his wife, the officers paused the

---

[1] Goff testified that he did not move the Mercedes himself because he was not familiar with the car and did not "want to assume any liability for operating that vehicle."

towing process. While waiting for appellant's wife to arrive, Goff asked Thompson if he should "just go the weapons frisk route . . . based on [appellant's] history." Thompson also told Goff that it was "kind of concerning" that appellant had a satchel "tucked right up right under his legs."

The unnamed man went to appellant's nearby home and, after several minutes, determined that appellant's wife either was not there or was not responding.[2] The police resumed the tow process when they could not locate appellant's wife. Thompson obtained a standard Newport News Police Department tow sheet from Goff and began filling it out with information about the car. While there was no particular order designated for an inventory search in the Newport News Police Department's "Towing, Inventory & Impoundment of Vehicles" policy ("inventory search policy"), Thompson stated that he generally started such a search "with the driver area and kind of work[ed] [his] way around the car and usually end[ed] at the trunk," but this could "vary depending on the situation." Thompson began the search of appellant's car at the driver's seat. As he reached under the seat, he found a satchel containing suspected narcotics, later analyzed and found to be cocaine, on the floorboard of the driver's seat. Thompson immediately stopped the inventory search and alerted Goff about the discovery. The officers then started a narcotics investigation.

At the suppression hearing, the Commonwealth introduced Goff and Thompson's body camera footage of the traffic stop.

The Commonwealth also introduced the inventory search policy, which provides that officers "may tow" an illegally parked vehicle in five circumstances, including when the vehicle impedes the movement of traffic.[3] The policy also lists eight requirements for an officer to follow

---

[2] Appellant's wife later appeared at the scene after the police searched the car and found contraband.

[3] The policy also allows officers to tow an illegally parked vehicle that is: (1) parked in a properly posted no parking zone; (2) parked in a manner creating a public safety threat and in violation of state or city code; (3) parked in fire lane; or (4) interfering with ingress or egress on any premises, driveway, or parking area without the property owner's permission.

after ordering that a vehicle be towed. The officer must: (1) provide the owner with the wrecker company name and the vehicle storage location, (2) complete a tow sheet, (3) add lien holder information to the tow sheet, (4) provide certain information regarding what type of tow service is required, (5) verify the Vehicle Identification Number ("VIN") by inspecting the VIN plate, (6) conduct a stolen vehicle check, "when appropriate," using both the VIN and license plate, (7) conduct a "complete and thorough inventory of the vehicle" and include an inventory list on the tow sheet, and (8) remain with the vehicle until the vehicle is removed.

At the hearing, counsel for appellant cross-examined Thompson on whether he had complied with the requirements set forth in the inventory search policy. While the tow sheet was not introduced into evidence, Thompson testified that it included an inventory of items found in the car, although he could not remember exactly what was included on the inventory. In addition, he stated that at some point during the stop, the officers gave appellant the name of the tow company used to tow the car. Thompson also notified the tow company of the type of truck needed to tow appellant's car and used appellant's license plate number to check if the car was stolen. Thompson did not recall whether he verified the car's VIN by inspecting the VIN plate. Thompson further testified that the purpose of an inventory search was "not to look for contraband," but rather "to find anything of value and notate that."

Appellant moved to suppress all evidence obtained pursuant to the stop, which the trial court denied. The court found that Goff's knowledge, obtained a day prior to the stop, that appellant's driver's license had been suspended provided the officer with reasonable suspicion to stop appellant's car. The court further found that the warrantless search of the car was justified under the community caretaker exception.

This appeal followed.

## II. ANALYSIS

"[W]hen a defendant challenges the denial of a motion to suppress, he has the burden to show that the trial court's ruling constituted reversible error." *Adams v. Commonwealth*, 48 Va. App. 737, 745 (2006). "Since the constitutionality of a search and seizure under the Fourth Amendment involves questions of law and fact, we give deference to the factual findings of the trial court but independently decide whether, under the applicable law, the manner in which the challenged evidence was obtained satisfies constitutional requirements." *Jackson v. Commonwealth*, 267 Va. 666, 672 (2004). This Court is "bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." *Cantrell v. Commonwealth*, 65 Va. App. 53, 56 (2015) (quoting *McGee v. Commonwealth*, 25 Va. App. 193, 198 (1997) (en banc)).

### A. Reasonable Suspicion for Traffic Stop

Appellant argues that the trial court erred in finding that the traffic stop was supported by reasonable suspicion.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The Fourth Amendment prohibits only unreasonable searches and seizures." *Thompson v. Commonwealth*, 54 Va. App. 1, 7 (2009) (quoting *James v. Commonwealth*, 22 Va. App. 740, 745 (1996)). "Reasonableness is judged from the perspective of a reasonable officer on the scene allowing for the need of split-second decisions and without regard to the officer's intent or motivation." *Id.* (quoting *Scott v. Commonwealth*, 20 Va. App. 725, 727 (1995)).

"[A] police officer may, without violating the Fourth Amendment, make a brief investigatory stop of a person when the officer has a reasonable suspicion, based on objective

- 5 -

facts, that criminal activity may be afoot." *Mason v. Commonwealth*, 291 Va. 362, 367 (2016). It is thus lawful under the Fourth Amendment for a police officer to detain an individual upon reasonable, articulable suspicion that he is "involved in, or ha[s] *recently* been involved in, some form of criminal activity." *Hairston v. Commonwealth*, 67 Va. App. 552, 564 (2017) (quoting *Logan v. Commonwealth*, 19 Va. App. 437, 441 (1994) (en banc)). Reasonable suspicion requires more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry v. Ohio*, 392 U.S. 1, 27 (1968). "In determining whether a police officer had a particularized and objective basis for suspecting that a person stopped may be involved in criminal activity, a court must consider the totality of circumstances." *Parker v. Commonwealth*, 255 Va. 96, 104 (1998).

Appellant argues that the traffic stop in this case was not supported by reasonable suspicion because Goff did not have any information about appellant's current license status and his "outdated and incomplete information" could not justify the stop. We reject appellant's argument and instead conclude that the day-old information regarding appellant's license was close enough in time to provide the officer with a reasonable belief that appellant was engaged in criminal activity. In this case, while at work the day before the stop, Goff had confirmed that appellant's driver's license had been suspended. Under Code § 46.2-301(B), it is unlawful for a person whose license has been suspended or revoked to drive on any Virginia highway. One day after learning that appellant's license had been suspended, Goff saw appellant driving his Mercedes sedan. It was reasonable for Goff to suspect that appellant's license status had not changed since the previous day. Accordingly, the officer had reasonable suspicion that appellant was violating Virginia law by driving with a suspended license and he was justified in conducting a traffic stop to investigate.

B.  Inventory Search

Appellant also challenges the warrantless search of his car.

"Searches and seizures conducted without a warrant are presumptively invalid." *Knight*, 71 Va. App. at 783 (quoting *Cantrell*, 65 Va. App. at 59).  Nonetheless, police may conduct a warrantless inventory search of a vehicle under the community caretaker exception if the following conditions are met: "1) the vehicle must be lawfully impounded; 2) the impoundment and subsequent search must be conducted pursuant to standard police procedures; and 3) the impoundment and subsequent search must not be a pretextual surrogate for an improper investigatory motive." *Id.* at 784 (quoting *Cantrell*, 65 Va. App. at 59).  The trial court found that the facts and circumstances satisfied all three conditions to justify the inventory search of appellant's car, and we agree.

1.  Lawful Impoundment

First, we consider the validity of the impoundment.  *See King v. Commonwealth*, 39 Va. App. 306, 311 (2002) ("The validity of the impoundment is a question separate from the validity of the subsequent inventory search and must be determined first.").  "We must consider 'not whether there was a need for the police to impound [the] vehicle but, rather, whether the police officer's decision to impound was reasonable under the circumstances.'" *Williams v. Commonwealth*, 42 Va. App. 723, 731 (2004) (alteration in original) (quoting *United States v. Brown*, 787 F.2d 929, 932 (4th Cir. 1986)).  As the testimony and the body camera footage demonstrated, after appellant was told to exit the car, the Mercedes remained parked in a manner obstructing traffic.  Goff confirmed that appellant's driver's license had been suspended, so appellant was unable to drive lawfully.  The vehicle was five feet from the curb with the front end extending into the road.  The trial court expressly found that appellant's car was parked in "a

position to obstruct traffic," and on appeal we cannot say this finding was plainly wrong. Under these circumstances, Goff's decision to impound the vehicle was objectively reasonable.

2. Standard Police Procedures

Second, we consider whether the impoundment and subsequent search were conducted pursuant to standard police procedures. In regard to the impoundment itself, the inventory search policy expressly provided for towing of a vehicle parked in a manner that was obstructing traffic; thus, the impoundment at issue was permitted under the policy.

We also conclude that the search itself was conducted in a manner consistent with the requirements of the inventory search policy. Thompson first obtained a tow sheet and then initiated an inventory search. When he reached under the driver's seat, Thompson found the satchel containing suspected narcotics, then immediately ended the inventory search and began a narcotics investigation. *See United States v. Johns*, 469 U.S. 478, 484 (1985) ("A vehicle lawfully in police custody may be searched on the basis of probable cause to believe that it contains contraband, and there is no requirement of exigent circumstances to justify such a warrantless search."). Appellant asserts that there was no evidence in the record indicating that the officers completed several of the eight requirements of the inventory search policy. But appellant's argument fails to recognize that the inventory search was transformed into a separate investigation once Thompson had probable cause to search the rest of the car after finding suspected narcotics under the driver's seat. We conclude that nothing in the record demonstrates that the officers failed to adhere to the inventory search policy prior to the discovery of the narcotics in the car.

Appellant also argues that the inventory search was not justified as a warrantless search because the inventory search policy does not properly limit an officer's discretion. In regard to a police department's inventory search policy, "[t]o justify a warrantless search, the standardized

criteria must sufficiently limit a searching officer's discretion to prevent his search from becoming 'a ruse for a general rummaging in order to discover incriminating evidence.'" *Cantrell*, 65 Va. App. at 61 (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990)). "Policies must provide officers discretion only to the extent necessary to effectuate the purposes of an inventory search—otherwise inventory searches could devolve into '"a purposeful and general means of discovering evidence of crime."'" *Id.* (quoting *Wells*, 495 U.S. at 4).

Here, appellant notes that the inventory search policy gives an officer complete discretion on whether to tow a vehicle. He argues that this discretion fails to provide standardized criteria that sufficiently limit an officer's discretion.[4] However, discretion as to impoundment is permissible "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Colorado v. Bertine*, 479 U.S. 367, 375 (1987). The inventory search policy in this case does allow for officer discretion, but this discretion is based on standard criteria related to law enforcement's community caretaking function. The policy provides that an officer may tow a vehicle when a vehicle is illegally parked. Further, a tow of an illegally parked vehicle is permitted only under certain circumstances, including, as here, where the vehicle impedes the movement of traffic. *See South Dakota v. Opperman*, 428 U.S. 364, 369 (1976) ("The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge."). Because the search inventory policy does not give an officer unlimited discretion and does not allow impoundment based solely on the suspicion of criminal activity, we conclude that the policy falls within the confines of the community caretaker exception.

---

[4] Appellant also argues on brief that the inventory search policy has no standardized criteria concerning how an officer must conduct an inventory search. However, appellant failed to make this specific argument to the trial court, thus we do not consider it on appeal. *See* Rule 5A:18.

3. Pretextual Motive

Third, we review whether the impoundment and subsequent search were merely a pretext concealing an investigatory motive by the officers. Whether the impoundment was merely a "pretextual surrogate" for concealing an "investigatory motive" by the police is a question of fact. *Knight*, 71 Va. App. at 784 (quoting *Cantrell*, 65 Va. App. at 59). As noted above, we are bound by this factual finding unless it was plainly wrong or without supporting evidence. *Cantrell*, 65 Va. App. at 56.

We conclude that the record supports the trial court's factual finding that the inventory search was not pretextual. After the traffic stop, Goff confirmed that appellant's driver's license had been suspended, so appellant was unable to drive lawfully. The way appellant had parked the Mercedes impeded traffic. Notwithstanding their authority to proceed with the tow of the car, the officers paused the procedure when it appeared that appellant might find someone else to move the car. Only when a passerby failed to find appellant's wife did the officers reinitiate the towing process, thus demonstrating that their intent in towing the vehicle and conducting an inventory search was not simply to search for contraband.[5]

---

[5] Appellant asserts, however, that other actions of the officers showed that the towing and search were pretextual in nature, relying on *Cantrell* and *Knight* in support of his argument. In *Cantrell*, the officer testified that his standard procedure during an inventory search was to search for contraband, and our Court found that this admission established that the officer's search "was not for the benign purposes underlying the community caretaker exception" but rather "was to improperly search for contraband and other evidence of crime." 65 Va. App. at 64. In *Knight*, the officers involved in the stop "discussed whether, and how, they could search" a vehicle stopped for a traffic infraction for "weapons and drugs." 71 Va. App. at 778. When they discovered that the defendant had an outstanding warrant, one officer "pumped his fist in a 'yes!!!' gesture." *Id.* The officer conducting the inventory search did not record the contents of the car at any point during the search. *Id.* at 780. The other officer testified that in conducting the inventory search, "there would be a decent likelihood that there could be a weapon in the vehicle, so that's kind of what would be on [their] minds" while searching the car. *Id.* at 779 (alteration in original). In their report summaries, the officers listed the reason for the search as "incident to arrest" rather than an inventory search. *Id.* at 780. Our Court affirmed the trial court's finding that the inventory search of the defendant's car was in fact an improper investigatory search for contraband. *Id.* at 786-87.

Accordingly, we conclude that the evidence established that appellant's car was lawfully impounded, that the impoundment and search were conducted pursuant to standard police procedures, and that the search was not pretextual in nature. Thus, the trial court did not err in finding that the community caretaker exception applied and denying the motion to suppress evidence seized from appellant's car on this basis.

## III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

*Affirmed.*

---

In equating the instant case to *Cantrell* and *Knight*, appellant first asserts that the officers here discussed their desire to search appellant's car. However, the officers here proceeded to search only after appellant's wife could not be located. Further, unlike the officer in *Cantrell*, Thompson testified that the purpose of the inventory search was "not to look for contraband" but rather "to find anything of value and notate that." Appellant also asserts that the officers made no effort to conduct a proper inventory of the items within the car, similar to the officer in *Knight*. But here, unlike the officers in *Knight*, Thompson found the satchel containing suspected narcotics almost immediately after initiating the inventory search, and thus ended that search once there was probable cause to start a separate narcotics investigation. Viewing the totality of the circumstances, we conclude that the officers' discussions about a possible search and actions in conducting the inventory search did not demonstrate that their overriding purpose was to search the car for contraband, especially in light of the fact that appellant was given the opportunity to contact his wife to attempt to have her move the car.